JUDGE KARAS

# 12 CIV 7611

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOSEPH TEEVAN,

                    Plaintiff,

- against -

GEORGE N. LONGWORTH,
Commissioner of Public Safety for
Westchester County, in his official and
personal capacities; JOSEPH J. YASINSKI,
Deputy Commissioner of Public Safety for
Westchester County, in his official and
personal capacities; KIERAN O'LEARY,
Public Information Officer of the Westchester
County Department of Public Safety, in his
official and personal capacities; THOMAS
GLEASON, Captain and Commanding Officer
of the Patrol Services Division of the
Westchester County Department of Public
Safety, in his official and personal capacities;
and COUNTY OF WESTCHESTER,

                    Defendants.

12 Civ. _____

## COMPLAINT

**Jury Trial Demanded**



Joseph Teevan ("Plaintiff"), by his attorneys, alleges as follows for his Complaint against

George N. Longworth, Commissioner of the Department of Public Safety for Westchester

County (the "Department"), in his official and personal capacities; Joseph J. Yasinski, Deputy

Commissioner of the Department, in his official and personal capacities; Thomas Gleason,

Captain, Commanding Officer of the Patrol Services Division of the Department, in his official

and personal capacities; Kieran O'Leary, Public Information Officer of the Department, in his

official and personal capacities (collectively, "Individual Defendants"); and the County of

Westchester (collectively with Individual Defendants, "Defendants"):

## PRELIMINARY STATEMENT

1.      Defendants flagrantly violated Plaintiff's rights when they released *sealed* information about his arrest—including his name, photograph, criminal charges that had already been dismissed, and town of residence—to hundreds of members of the media.  Defendants' improper conduct caused Plaintiff to be publicly identified in a media blitz on television, in newspapers, and over the internet as having been arrested on sex charges in a police sting dubbed "Operation Overexposed," which targeted gay men[*] for allegedly seeking same-sex partners at Saxon Woods Park in Westchester County.  The information generated and released by Defendants remains to this day publicly available on numerous internet sites, and will continue to haunt and harm Plaintiff for years to come.  Defendants unlawfully sought to disparage, humiliate, and publicly stigmatize Plaintiff by widely publicizing his arrest despite the fact that (a) the criminal charges against Plaintiff already had been dismissed, (b) the matter was resolved as a minor, non-criminal violation, (c) Defendants had been ordered by the court to seal Plaintiff's arrest information and return his mug shot photograph to him, and (d) a state statute expressly prohibited Defendants from releasing the information.

2.      Defendants' misconduct is yet another manifestation of generations' old police tactics designed to publicly humiliate, stigmatize, and harass gay men.  Police arrests of gay men on charges like those here followed by deliberate efforts to publicize those arrests have caused countless gay men damage to their reputations, harm in their employment, shunning in their communities, and even to be driven to suicide.  Police commonly assume that men harassed for allegedly seeking consensual same-sex partners will fear further public attention and therefore will not challenge the police misconduct.  In this case, Defendants have defied court sealing

---

[*] As used herein, references to gay men include both gay and bisexual men, who suffer discrimination based on sexual orientation.

orders and state law, and continue to do so, in order to publicly shame Plaintiff and other men perceived to be gay. Defendants must be held accountable for violating Plaintiffs' rights and deterred from flouting the law and court orders, particularly where a minority group, such as gay men, has been victimized.

3.     Defendants' discriminatory conduct, based on Plaintiff's actual or perceived sexual orientation, violated Plaintiff's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution, as well as under Article 1, § 11 of the Constitution of the State of New York. Defendants' release of these sealed records also violated the express terms of a court order and state law—New York Criminal Procedure Law ("C.P.L.") § 160.55— enacted to prevent precisely the public stigma and reputational damage that Defendants inflicted on Plaintiff.

4.     Plaintiff seeks declaratory and injunctive relief requiring Defendants (a) to comply with the laws equally, without regard to the actual or perceived sexual orientation of arrestees, as required under the constitutional guarantee of equal protection of the laws, (b) to comply with court-ordered and statutorily-mandated requirements that they not disclose arrest information about Plaintiff and others protected from such stigmatizing police tactics, and (c) to return Plaintiff's arrest photographs and fingerprints, as expressly required by court order and state statute. Plaintiff also seeks compensatory and punitive damages.

**PARTIES**

5.     Plaintiff, a gay man, resides and works in White Plains, in Westchester County, New York.

6.     Defendant George N. Longworth was, at all times relevant to this complaint, the Commissioner of the Department, the Westchester County law enforcement agency responsible

3

for policing the County's parks, parkways, and facilities. As Commissioner, Defendant

Longworth ordered, approved, or otherwise caused, and was personally responsible for, the

release of Plaintiff's sealed arrest information to the public and the media. Based on information

from, among other sources, the Department's 2011 Annual Report and the Department's

purported written policies regarding court-ordered sealing of records (Department General Order

No. 46.04) and release of information to the community and news media (Department General

Order No. 34.01), Defendant Longworth has responsibility for supervising and overseeing the

maintenance of records received and created by the Department and its staff, including ensuring

that arrest records sealed pursuant to C.P.L. § 160.55 are not released to third parties. Defendant

Longworth also has responsibility for making statements to and interacting with the public and

the media regarding Department arrests, investigations, and other matters, and for supervising

others involved in release of such information. As Commissioner, Defendant Longworth has

final policymaking authority and acts in a policymaking function for Defendant Westchester

County. At all relevant times, Defendant Longworth was acting within the scope of his

employment and under color of state law. Defendant Longworth is sued in his official and

personal capacities.

       7.     Defendant Joseph J. Yasinski was, at all times relevant to this complaint, the

Deputy Commissioner of the Department. While Deputy Commissioner, Defendant Yasinski

ordered, approved, or otherwise caused, and was personally responsible for, the release of

Plaintiff's sealed arrest information to the public and the media. Based on information from,

among other sources, the Department's 2011 Annual Report and the Department's purported

written policies regarding court-ordered sealing of records (Department General Order No.

46.04) and release of information to the community and news media (Department General Order

No. 34.01), Defendant Yasinski has responsibility for supervising and overseeing the maintenance of records received and created by the Department and its staff, including ensuring that arrest records sealed pursuant to C.P.L. § 160.55 are not released to third parties. Defendant Yasinski also has responsibility for making statements to and interacting with the public and the media regarding Department arrests, investigations, and other matters, and for supervising others involved in release of such information. As Deputy Commissioner, Defendant Yasinski acts in a policymaking function for Westchester County. At all relevant times, Defendant Yasinski was acting within the scope of his employment and under color of state law. Defendant Yasinski is sued in his official and personal capacities.

8.      Defendant Kieran O'Leary was, at all times relevant to this complaint, the Public Information Officer for the Department. As Public Information Officer, Defendant O'Leary ordered, approved, or otherwise caused, and was personally responsible for, the release of Plaintiff's sealed arrest information to the public and the media. Based on information from, among other sources, the Department's 2011 Annual Report and the Department's purported written policies regarding court-ordered sealing of records (Department General Order No. 46.04) and release of information to the community and news media (Department General Order No. 34.01), Defendant O'Leary is responsible for disseminating information to the community and news media, including preparing and distributing press releases, conducting press conferences, making statements to the media, and coordinating media statements by other Department members. He is also responsible for ensuring that arrest records sealed pursuant to C.P.L. § 160.55 are not released to third parties. At all relevant times, Defendant O'Leary was acting within the scope of his employment and under color of state law. Defendant O'Leary is sued in his official and personal capacities.

9.      Defendant Thomas Gleason was, at all times relevant to this complaint, Captain and Commanding Officer of the Department's Patrol Services Division.  While in this position, Defendant Gleason ordered, approved, or otherwise caused, and was personally responsible for, the release of Plaintiff's sealed arrest information to the public and the media.  Based on information from, among other sources, the Department's 2011 Annual Report and the Department's purported written policies regarding court-ordered sealing of records (Department General Order No. 46.04) and release of information to the community and news media (Department General Order No. 34.01), Defendant Gleason has responsibility for supervising and overseeing the maintenance of records received and created by the Department and its staff, including ensuring that arrest records sealed pursuant to C.P.L. § 160.55 are not released to third parties.  Defendant Gleason also has responsibility for making statements to and interacting with the public and the media regarding Department arrests, investigations, and other matters, and for supervising others involved in release of such information.  At all relevant times, Defendant Gleason was acting within the scope of his employment and under color of state law.  Defendant Gleason is sued in his official and personal capacities.

10.      Defendant County of Westchester (the "County") is a municipal corporation organized under the Constitution and laws of the State of New York.  At all relevant times, Defendant County, through the Department, has been responsible for executing and administering the laws, policies, customs, and practices at issue in this lawsuit, and for the appointment, supervision, training, and conduct of all Department personnel, including the Individual Defendants referenced herein.  Defendant County has been responsible for ensuring that Department personnel obey the laws of the United States and the State of New York and orders of the courts.  Plaintiff challenges actions taken by officials with final policymaking

authority. Defendant County and the discriminatory policies, customs, and practices followed here caused the injuries suffered by Plaintiff. Defendant County has applied, and continues to apply, the challenged policies, customs, and practices in violation of Plaintiff's rights.

## JURISDICTION AND VENUE

11.     This Complaint is brought pursuant to 42 U.S.C. § 1983 for violation of the Fourteenth Amendment to the U.S. Constitution, as well as pursuant to the Constitution of the State of New York and New York state law. All of the claims in this action form part of the same case or controversy. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1367, 2201, and 2202.

12.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) because at least one Defendant resides in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

## ALLEGATIONS OF FACT

### "Operation Overexposed" and the Sealing of Plaintiff's Arrest Records

13.     From July through September 2011, the Department conducted a sting operation it dubbed "Operation Overexposed," which targeted gay men allegedly seeking same-sex partners while visiting Saxon Woods Park, a public park in White Plains, Westchester County.

14.     As part of Operation Overexposed, undercover officers stationed at Saxon Woods Park approached men visiting the park, feigned sexual interest, lured or followed those men into enclosed restroom stalls, and then arrested them.

15.     Between July and September 2011, at least sixteen men were arrested in Operation Overexposed on charges of public lewdness and/or forcible touching.

16.     On August 24, 2011, Plaintiff was arrested in Operation Overexposed and charged with forcible touching, New York Penal Law § 130.52, a Class A misdemeanor, and public lewdness, New York Penal Law § 245.00, a Class B misdemeanor.

17.     Between September 9, 2011 and October 12, 2011, the Westchester County District Attorney's Office dropped the criminal charges against at least thirteen of the arrested men, Plaintiff included, and the matters were resolved in White Plains City Court as minor, non-criminal violations.

18.     On October 7, 2011, the criminal charges against Plaintiff were dismissed in *People of the State of New York v. Teeven* [sic], No. 11-2594, in White Plains City Court, before the Honorable Jo Ann Friia.  Plaintiff pled guilty to disorderly conduct, classified as a non-criminal violation under New York Penal Law § 240.20.

19.     At that time, Judge Friia ordered Plaintiff's arrest records sealed pursuant to C.P.L. § 160.55.  Judge Friia stated on the record, "since the plea is to a violation only, C.P.L. 160.55 sealing order will attach to the file."

20.     C.P.L. § 160.55 applies when a criminal proceeding is terminated and resolved as a non-criminal violation and requires that the arrestee's police arrest records be sealed.  The sealing requirement is consistent with the presumption of innocence, part of the bedrock of our criminal justice system, and reflects the legislative objective to protect individuals from public stigma and opprobrium when they have been arrested but are not ultimately convicted of a criminal offense.

21.     C.P.L. § 160.55(1) specifically requires that:

> Upon the termination of a criminal action or proceeding against a person by the conviction of such person of a . . . violation, . . . the clerk of the court wherein such criminal action or proceeding was terminated shall immediately notify the commissioner of the

division of criminal justice services and the heads of all appropriate police departments and other law enforcement agencies that the action has been terminated by such conviction. Upon receipt of notification of such termination:

(a) every photograph of such person . . . , and all . . . fingerprints taken or made of such person . . . in regard to the action or proceeding terminated, . . . shall forthwith be . . . either destroyed or returned to such person . . . by the division of criminal justice services and by any police department or law enforcement agency having any such photograph . . . or fingerprints in its possession or under its control . . . .

(c) all official records and papers relating to the arrest or prosecution, including all duplicates and copies thereof, on file with the division of criminal justice services, police agency, or prosecutor's office shall be sealed and not made available to any person or public or private agency. . . .

22. Section 160.55 leaves no discretion in the hands of Defendants regarding (a) the requirement that an arrestee's mug shots and fingerprints be expunged from police records, and (b) the requirement that the police not publicly release information regarding the arrest.

23. Pursuant to and as required by § 160.55, on October 7, 2011, the court mailed notice of the sealing of Plaintiff's records to the Department—a fact that the Chief Clerk of the White Plains City Court has repeatedly confirmed. Upon information and belief, the sealing notice arrived at the Department within a couple of days of its October 7, 2011 mailing, and prior to October 14, 2011. Thus the Defendants knew before October 14, 2011 that Plaintiff's arrest information had been sealed.

24. Further pursuant to and as required under § 160.55, on or about October 7, 2011, the White Plains City Court sent an electronic transmission notifying the New York Division of Criminal Justice Services ("CJS") of the sealing of Plaintiff's records. CJS received the

notification from the White Plains City Court and on October 11, 2011 sealed Plaintiff's criminal history record related to his arrest and expunged his mug shot and fingerprints.

25.     Between September 9, 2011 and October 12, 2011, the criminal charges for at least twelve of the other men arrested in Operation Overexposed had been dismissed, with only violations charged instead, and the men's arrest records had been sealed by orders of judges of the White Plains City Court pursuant to C.P.L. § 160.55.  The Chief Clerk of the White Plains City Court has repeatedly confirmed that the court mailed notices of these twelve additional sealing orders to the Department on the same days the cases were sealed.  Accordingly, the sealing orders, sent from the White Plains City Court to the Department within the same County, would have arrived at the Department within a couple of days of mailing.

26.     The chart below lists, for each of these Operation Overexposed arrestees and Plaintiff, the court docket number of that individual's case, the White Plains City Court judge who issued the sealing order in the case, the date of the arrest, the date of sealing of the arrest records and of mail notice by the White Plains City Court to the Department, and the date the Department nonetheless publicly released the sealed information.

| Arrestee | Docket Number | White Plains City Court Judge | Arrest Date (2011) | Sealing and Mailing Date (2011) | Press Release Date (2011) |
|---|---|---|---|---|---|
| Plaintiff | 11-2594 | Friia | 8/24 | 10/7 | 10/14 |
| 2 | 11-2591 | Press | 8/25 | 9/9 | 10/14 |
| 3 | 11-2593 | Press | 8/25 | 9/9 | 10/14 |
| 4 | 11-2595 | Press | 8/26 | 9/9 | 10/14 |
| 5 | 11-2586 | Press | 8/26 | 9/9 | 10/14 |
| 6 | 11-2587 | Press | 8/26 | 9/9 | 10/14 |
| 7 | 11-2588 | Press | 8/26 | 9/9 | 10/14 |
| 8 | 11-2589 | Press | 8/26 | 9/9 | 10/14 |
| 9 | 11-2592 | Press | 8/26 | 9/9 | 10/14 |
| 10 | 11-2590 | Friia | 8/24 | 9/22 | 10/14 |
| 11 | 11-2584 | Friia | 8/24 | 9/28 | 10/14 |
| 12 | 11-2242 | Friia | 7/29 | 10/5 | 10/14 |
| 13 | 11-2728-S | Leak | 8/19 | 10/12 | 10/14 |

## Defendants' Intentional Release of Plaintiff's
## Sealed Records to the Public and the Media

27.     On Friday, October 14, 2011, Defendants sent sealed information about Plaintiff's

arrest—including his name, town of residence, photograph, and the original charges brought

against him but by then dismissed and sealed—to email addresses for approximately 200

national and local television, print, online, and radio media outlets, including ABC, CBS, NBC,

Fox, News 12, AP, Bloomberg, Gannett, The Journal News, The New York Times, The Wall

Street Journal, The Daily News, Westchester.com, LoHud.com, The White Plains Examiner,

Univision, Burlington Free Press, Patch, El Aguila, El Diario, The Examiner News, The

Westchester Guardian, Home Town Media Group, Main Street Connect, Lifestyle Talk Radio

Network, La Voz Hispana, The Daily Bronxville, The Daily White Plains, Mid-Hudson News,

New Castle Now, New Rochelle Talk, North County News, Parent Guide News, Peekskill Daily,

Pelham Weekly, Pluma Libre News, Record Review, Rising Publications, Rivertowns News,

Rockland Video, Rye Record, Scarsdale News, Shoreline Publishing, Sound Shore Review,

Suburban Street, The Tribune, Westfair Online, Westchester Business Journal, Westchester

Commerce, Westchester County Press, Westchester County Times, Westchester Hispano,

Westchester Parent, Westmore News, White Plains Times, WHUD Radio, WOR Radio Network,

White Plains Citizen Net Reporter, WVOX 1460 Radio, and The Yonkers Tribune.

28.     Defendants also sent the sealed information to more than 100 individuals who,

upon information and belief, hold Westchester County and other government positions, ranging

from employees of the County Department of Emergency Services and County Department of

Finance, to U.S. Senator Kirsten Gillibrand.

29.     Defendants sent to the same email addresses similar information about the other

twelve men described above who had also been arrested in Operation Overexposed but whose

charges had been dropped, with notification to Defendants of the sealing orders days or weeks

before Defendants' release of the information.

30.     On October 14, 2011 and over several following days, Individual Defendants

gave interviews to reporters, including on camera, and served as spokespeople about the arrests,

fanning interest in the Operation Overexposed arrests and in the men—Plaintiff included—

unlawfully publicly identified and stigmatized by Defendants.

31.     Thus, in at least thirteen different instances, Defendants followed a policy and

practice of defying court-issued sealing orders and state law to publicly release arrest

information regarding men accused by Defendants of public lewdness and/or forcible touching in

connection with allegations that those men were seeking sexual encounters with other men.

32.     Defendants intended and foresaw that the information they released about the

arrests of Plaintiff and these other men would be widely disseminated throughout Plaintiff's

12

community, Westchester County, and beyond. As intended, Defendants' conduct resulted in widespread publication of the story, with severe harm to Plaintiff.

33.     For example, on October 14, 2011, as a result of Defendants' conduct, an ABC station aired a television segment about Operation Overexposed. The segment began with the news anchor referring to "men on the prowl involved in illegal and shocking activity." Mug shot photos of the men—including Plaintiff—that had been provided by Defendants were displayed on the screen. The segment described Saxon Woods Park as a meeting place for gay men. Defendant Gleason was interviewed from what appeared to be his Department desk, claiming that "this was going on in public view on trails, and people, joggers and whatnot, would see this"—thus suggesting that Plaintiff and the other men whose mug shots appeared on air had been having same-sex sexual encounters in full public view before park-goers. The segment stated that the men had been charged with public lewdness and forcible touching.

34.     From October 14, 2011 through October 17, 2011, as a result of Defendants' conduct, News 12 aired at least four television segments about Operation Overexposed. News 12 stated that men were "having sex just feet away from where children play" in the park, and displayed on the screen the mug shots obtained from Defendants and, in some segments, the names of the arrested individuals, including Plaintiff, also obtained from Defendants. During one segment, Defendant O'Leary stated: "If you come to this park for the wrong reason, number one you're going to get arrested, and number two, your name's going to be put out to the media." In another segment Defendant O'Leary stated that "we wanted to be very public about" the arrests.

35.     In another News 12 segment, a reporter was shown trying to speak with individuals at the front doors of homes of men who Defendants had publicly identified as

arrestees.  The reporter announced that "it was the first time many of the relatives were hearing of the alleged crimes."

36.     Defendants' conduct also resulted in publication of the story in dozens of print and online media outlets.  For example, the story received prominent front-page coverage in the leading Westchester newspaper, The Journal News, complete with Plaintiff's photograph.

37.     As would be expected, Defendants' release of the information resulted in sensationalistic and inflammatory headlines, such as "16 Arrested at Saxon Woods in Public Sex Sting," "Operation Overexposed Cracks Down on Sexual Encounters at Saxon Woods," and "Sex Crackdown in White Plains' Saxon Woods Park Nets 16 Arrests."

38.     Many of the news accounts included the names, photographs, ages, towns of residence, and criminal charges of Plaintiff and other men arrested in Operation Overexposed— information which Defendants had publicized to the media.

39.     For example, on October 14, 2011, The White Plains Daily Voice published an online account of Defendants' sting operation, complete with names, ages, hometowns, and charges for Plaintiff and the others.  Each man's mug shot was published with the caption "Photo Courtesy of the Westchester County Police Department."  On December 26, 2011, The White Plains Daily Voice included the story in its retrospective of "The Top 10 White Plains Headlines of 2011."

40.     Media reports based on Defendants' release of sealed information quoted Defendant Longworth as stating, "If you come to Saxon Woods Park for this purpose, you will be arrested and your name will be released to the media."  Defendant Longworth was described in media reports as hoping that by publicizing the arrests, "the public would get involved and help deter" activity in the park by gay men.

41.     Defendant Longworth later acknowledged in a letter to Plaintiff's counsel that "I made the decision to release the information."

## The Unlawful Release of Plaintiff's Sealed Records
## Was Intended to and Did Stigmatize Plaintiff

42.     As a result of and as intended by Defendants' unlawful release of Plaintiff's arrest records, he has been stigmatized, humiliated, and disadvantaged in precisely the manner that C.P.L. § 160.55 was designed and intended to prevent.

43.     As a result of Defendants' misconduct, many of Plaintiff's former and present co-workers, family, friends, and acquaintances learned of Plaintiff's arrest through the news stories that Defendants instigated.

44.     Following Defendants' unlawful release of Plaintiff's arrest records and identifying information, a TV news crew waited outside his home, in full view of neighbors.

45.     The Journal News, complete with front page accounts of Plaintiff's arrest and his photograph provided by Defendants, was displayed in a newspaper box adjacent to his home in his White Plains co-op community and was widely available at his workplace.

46.     As a result of Defendants' conduct, Plaintiff was suspended for several days from his job at a White Plains hospital until he could obtain court records confirming that the arrest charges announced by Defendants had been dismissed.  When he was permitted to return to work, he was warned that he might not be safe from mistreatment by some at the facility inflamed by the press accounts Defendants had instigated.   Plaintiff's professional reputation and prospects have suffered as a result of Defendants' unlawful release of the sealed information.

47.     After Defendants publicized Plaintiff's arrest information, Plaintiff was told by the superintendent of his co-op association that other residents wanted him evicted based on the information Defendants wrongfully disseminated, and that the co-op board was meeting in

response.  Plaintiff was informed that neighbors were concerned he was a threat to children.  He was asked if he was a registered sex offender.

48.     As a result of Defendants' misconduct, Plaintiff has been subjected to ridicule and has been ostracized by neighbors, family members, co-workers, and others.

49.     In the days and weeks that followed Defendants' wrongful release of the sealed information, Plaintiff feared for his safety, and was afraid to appear in public or follow his normal routines.

50.     Defendants' misconduct caused Plaintiff severe emotional distress, and even drove Plaintiff to contemplate suicide.

51.     As made plain by such statements as Defendant Longworth's assertion to the media that "[w]e are going public with Operation Overexposed in the hope that it will be a further deterrent," when Defendants released the sealed arrest records to the media and the public they intended to cause precisely this type of public reaction and these consequences for Plaintiff and the other men arrested during Operation Overexposed.

52.     Information related to the media, including the since-dismissed charges and Plaintiff's arrest photograph, remains on many publicly available websites to this day, along with similar information about other men arrested in Operation Overexposed.

<u>Defendants Singled Out Plaintiff and Other<br>Men Perceived to Be Gay for Public Stigma</u>

53.     Upon information and belief, Defendants rarely issue press releases announcing arrests made by the Department.  For example, according to the Department's 2011 Annual Report, the Department made more than 1,500 arrests that year.  Yet the Department's online press archives include only ten press releases announcing arrests in 2011.  Moreover, in contrast to the Department's publicity for Operation Overexposed, nearly all those other press releases

issued within just days of the arrests, before any disposition of the charges would have occurred.

Unlike Operation Overexposed, those other releases did not issue months after the arrests were

made, at a point when a disposition triggering C.P.L. § 160.55's sealing requirement could have

been expected. One other 2011 release announced an inter-agency operation resulting in four

felony arrests of members of a single alleged crime gang, made over a few-week period, with the

release issuing the week after the last arrest and before dispositions of the charges would have

been likely.

54. Upon information and belief, in numerous cases criminal arrest charges initially

issued by the Department ultimately are dismissed, and the matters are resolved with pleas to

non-criminal violations such as the disorderly conduct charges that disposed of the cases of

Plaintiff and other Operation Overexposed arrestees. These dispositions, occurring in numerous

cases, trigger C.P.L. § 160.55's sealing requirement. Likewise, upon information and belief,

many criminal arrest charges are disposed of in favor of the accused, with neither criminal

convictions nor violations charged against the accused. These cases trigger C.P.L. § 160.50, a

sealing statute very similar to § 160.55.

55. Plaintiff is similarly situated to the numerous other arrestees whose criminal

charges are disposed of in a manner that triggers state sealing requirements. Yet, other than for

the men arrested in Operation Overexposed, who were perceived to be gay and alleged to have

sought same-sex partners, Defendants do not follow a policy or practice of releasing sealed arrest

information to the media. Indeed, Plaintiff is aware of no other instance, besides the Operation

Overexposed incidents, in which the Department has released sealed arrest information to the

media contrary to court order and state law.

56.     Upon information and belief, Defendants intentionally chose to release Plaintiff's sealed arrest information, as well as that of other men arrested in Operation Overexposed, based on the perceived sexual orientation of these men and their alleged interest in same-sex sexual conduct.

57.     Upon information and belief, Defendants intentionally chose to ignore and violate the court order and state law sealing Plaintiff's arrest records, and those of others arrested in Operation Overexposed, based on the actual or perceived sexual orientation of these men.

58.     Defendants lacked any legitimate or even rational basis for releasing Plaintiff's sealed arrest information in violation of state law and court order.

### Defendants' Implausible Claims Regarding the Sealing Notices and Ongoing Refusal to Comply with the Court-Ordered and Statutory Requirement That They Expunge Plaintiff's Mug Shots and Fingerprint Records

59.     In addition to the sealing notice that Defendants received from the White Plains City Court prior to their wrongful release of Plaintiffs' arrest records, Defendants subsequently received additional confirmations that Plaintiff's arrest information was sealed pursuant to C.P.L. § 160.55.

60.     On October 17, 2011, Plaintiff's counsel sent a letter to Defendant Longworth, copying White Plains City Court Judges Press and Friia, objecting to Defendants' release of the arrest information and stating (as Defendants already would have known) that on October 7, 2011, Plaintiff's records had been ordered sealed by Judge Friia pursuant to C.P.L. § 160.55.

61.     On October 19, 2011, The New York Times published an article reporting that

> last week, the county police took the unusual step of releasing to the news media the names and photos of 16 men it said had engaged in unlawful sexual activity in Saxon Woods. The idea was to create a fear of being publicly shamed. Now, however, that public relations campaign has backfired, with lawyers for some of the men coming forward to say that their clients had pleaded guilty

18

to nonsexual violations and that their cases were supposed to have been sealed. In fact, 11 of the 16 cases had already been adjudicated and sealed when the county police gave out the names, photographs and charges last Friday. All but one of the men, who ranged in age from 37 to 75, pleaded guilty to a lesser charge of disorderly conduct, a noncriminal violation.

62.     Representatives from the Department, including Defendants Yasinski and O'Leary, gave statements for the article and implausibly claimed that in not one of at least a dozen cases had the Department received the sealing notices from the courts.

63.     On October 20, 2011—after inflicting tremendous harm on Plaintiff—Defendant Longworth acknowledged in a letter to Plaintiff's counsel, copied to Judges Press and Friia, that Plaintiff's case "had been sealed by the court," and "that sealed arrest information on your clients was released to the public[.]" He reiterated the implausible claim that the Department had not received sealing notices from the court.

64.     In response, on October 25, 2011, the Chief Clerk of the White Plains City Court, Patricia Lupi, wrote a letter to Plaintiff's counsel, copying Defendant Longworth, stating that "the information provided . . . by Commissioner Longworth was not accurate." Chief Clerk Lupi confirmed that Plaintiff's records had indeed been sealed on October 7, 2011 under C.P.L. § 160.55. She further confirmed that notice of the sealing in Plaintiff's case, as well as in all the others involved, had been mailed by the court to the Department on the same day that each of the cases was sealed, in Plaintiff's case on October 7, 2011.

65.     Despite their knowledge of the sealing order, Defendants continue to this day to violate Plaintiff's rights by refusing to return his photograph and fingerprint records, as required by the court's order and C.P.L. § 160.55(1)(a).

66.     In a letter dated November 30, 2011, addressed to Defendant Longworth, Plaintiff's counsel expressly requested return of Plaintiff's photographs and fingerprints, pursuant to C.P.L. § 160.55(1)(a).

67.     In a letter dated January 5, 2012, Defendant Longworth refused the request, falsely claiming that "[t]his office has not received notification from the White Plains clerk of the court that the action against your client has been terminated by the conviction of your client of a . . . violation, as required by NYCPL § 160.55(1). As the terms of subparagraph (a) do not take effect until such notification is received, your request is denied."

68.     At that point, the Department had received not only the original sealing notice sent by the White Plains City Court on October 7, 2011, but also the letter from the White Plains Chief Clerk of the Court dated October 25, 2011, copying Defendant Longworth himself and expressly confirming that the action against Plaintiff had been sealed on October 7, 2011.

69.     Contrary to Defendant Longworth's preposterous claims that his Department has never received notification that Plaintiff's case is sealed and governed by C.P.L. § 160.55, on January 26, 2012, White Plains City Court Chief Clerk Lupi yet again confirmed in a letter to Plaintiff's counsel that the court had mailed to the Department notice of Plaintiff's sealing order on October 7, 2011, and mailed notice of the sealing orders for other Operation Overexposed arrestees on the dates shown in the chart in paragraph 26 above.

70.     Plaintiff's counsel has provided Defendants' counsel, a Senior Assistant Westchester County Attorney, with the string of correspondence described above among Plaintiff's counsel, Defendant Longworth, and Chief Clerk Lupi, including Plaintiff's request for return of his mug shot and fingerprints and Defendant Longworth's refusal of that request. Yet

to this day, Defendants have failed to comply with their obligation under C.P.L. § 160.55(1)(a) to return these materials to Plaintiff.

### Plaintiff's Compliance with Notice of Claim Requirements

71.     On January 9, 2012, Plaintiff served a Notice of Claim upon Defendant County and Defendant Longworth pursuant to § 50-e of the General Municipal Law and § 52 of the New York County Law.

72.     On May 15, 2012, Defendants conducted an examination of Plaintiff pursuant to § 50-h of the General Municipal Law.

### FIRST CLAIM FOR RELIEF

### Equal Protection – Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 (Against All Defendants)

73.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 72 as if fully set forth herein.

74.     By releasing Plaintiff's sealed records, Defendants intentionally treated Plaintiff differently from other similarly situated individuals.

75.     This differential treatment by Defendants was motivated by Plaintiff's actual or perceived sexual orientation.

76.     It is clearly established law that, under the Equal Protection Clause of the U.S. Constitution, government actors cannot single out people for adverse treatment based on actual or perceived sexual orientation, where that adverse treatment is not at least rationally related to a legitimate government interest, which did not exist in this case.

77.     Under federal law, animus based on actual or perceived sexual orientation is never a legitimate government interest.

78.    Defendants' actions have denied Plaintiff the equal protection of the laws guaranteed under the Fourteenth Amendment to the United States Constitution.

79.    Plaintiff was harmed and has suffered damages as a result of the Defendants' misconduct.

## SECOND CLAIM FOR RELIEF

### Equal Protection – New York Constitution, Article I, § 11
### (Against All Defendants)

80.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 79 as if fully set forth herein.

81.    By releasing Plaintiff's sealed records, Defendants treated Plaintiff differently from other similarly situated individuals.

82.    This differential treatment by Defendants was motivated by Plaintiff's actual or perceived sexual orientation.

83.    It is clearly established law that, under Article I, § 11 of the New York Constitution, New York government actors cannot single out people for adverse treatment based on actual or perceived sexual orientation, where that adverse treatment is not at least rationally related to a legitimate government interest, which did not exist in this case.

84.    Under New York law, animus based on actual or perceived sexual orientation is never a legitimate government interest.

85.    Defendants' actions have denied Plaintiff the equal protection of the laws guaranteed under Article I, § 11 of the New York State Constitution.

86.    Plaintiff was harmed and has suffered damages as a result of the Defendants' misconduct.

## THIRD CLAIM FOR RELIEF

### Violation of C.P.L. § 160.55
### (Against All Defendants)

87.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 86 as if fully set forth herein.

88.     Defendants have a statutory duty under C.P.L. § 160.55 to seal Plaintiff's arrest records and to return or destroy the photographs and fingerprints from his arrest.

89.     Plaintiff is a member of the class of persons for whose benefit C.P.L. § 160.55 was enacted.  The statute was enacted to protect individuals like Plaintiff from disclosure of sealed records and from potential stigma and harm resulting from that release.

90.     Defendants violated § 160.55 by releasing sealed information relating to Plaintiff's arrest—including his name, photograph, and the criminal charges—to hundreds of members of the media and public.

91.     At the time they released the information, Defendants had received an order from the White Plains City Court sealing Plaintiff's arrest records.  Defendants acted knowingly or, at a minimum, negligently in releasing Plaintiff's sealed arrest records to the media and public.

92.     Furthermore, Defendants intentionally violated—and continue to violate—§ 160.55 by refusing to return or destroy Plaintiff's photograph and fingerprint records, in breach of their duty to Plaintiff.

93.     Defendant County, as the employer of each of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

94.     Plaintiff was harmed and has suffered damages as a result of the Defendants' misconduct.

## FOURTH CLAIM FOR RELIEF

### Negligence – New York Common Law
### (Against All Defendants)

95.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 94 as if fully set forth herein.

96.     When Plaintiff's arrest was resolved as a non-criminal violation, Defendants owed a duty to Plaintiff to seal his arrest records and return or destroy his photograph and fingerprint records from the arrest.

97.     Defendants breached their duty to seal Plaintiff's arrest records by releasing information related to his arrest—including his name, photograph, town of residence, and the dismissed criminal charges—to hundreds of members of the press and public.

98.     Defendants failed to exercise reasonable care to ensure that they were not releasing sealed information related to Plaintiff.

99.     Defendants further breached—and continue to breach—their duty to Plaintiff by intentionally refusing to return or destroy his photograph and fingerprint records from the arrest, despite knowledge of their obligation to do so.

100.    Defendant County, as the employer of each of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

101.    Plaintiff was harmed and has suffered damages as a result of the Defendants' misconduct.

## FIFTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress
### (Against Individual Defendants)

102.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

103.    Defendants' intention in releasing Plaintiff's sealed arrest information was to obtain widespread publicity about Plaintiff's arrest throughout Plaintiff's community and beyond, and to thereby stigmatize, humiliate, shame, and injure Plaintiff.

104.    Defendants engaged in extreme and outrageous conduct, intolerable in a civilized society.

105.    Defendants acted with malice and the intent to cause Plaintiff severe emotional distress, or disregarded the substantial probability that their actions would cause Plaintiff severe emotional distress.

106.    Defendants' conduct was the actual, direct, and proximate cause of the humiliation, indignity, mental anguish, emotional distress, and other injuries Plaintiff suffered.

107.    Plaintiff was harmed and has suffered damages as a result of the Defendants' misconduct.

### JURY DEMAND

108.    Plaintiff demands a jury trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1.    Awarding Plaintiff compensatory damages in an amount to be proven at trial;

2.    Awarding Plaintiff punitive damages in an amount to be proven at trial;

3.      Permanently enjoining Defendants from disclosing Plaintiff's sealed arrest information and requiring Defendants to comply with C.P.L. § 160.55 by destroying or returning to Plaintiff all photographs and fingerprints related to Plaintiff's arrest;

4.      Declaring that Defendants have committed the violations alleged in this action;

5.      Awarding Plaintiff's counsel attorneys' fees, costs, and disbursements, including but not limited to fees, costs, and disbursements pursuant to 42 U.S.C. § 1988;

6.      Awarding Plaintiff pre-judgment and post-judgment interest, to the fullest extent available, on the foregoing monetary awards; and

7.      Providing such other and further relief as may be just and proper.

Dated:    October 11, 2012
          New York, New York

By:    _____
       Susan Sommer (ssommer@lambdalegal.org)
       LAMBDA LEGAL DEFENSE &
       EDUCATION FUND, INC.
       120 Wall Street, 19th Floor
       New York, NY 10005
       (212) 809-8585

       LANKLER SIFFERT & WOHL LLP
       Frank Wohl (fwohl@lswlaw.com)
       Andrew Lee (alee@lswlaw.com)
       Patrick Toomey (ptoomey@lswlaw.com)
       500 Fifth Avenue
       New York, NY 10110
       (212) 921-8399

       *Attorneys for Plaintiff*